1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## EASTERN DISTRICT OF CALIFORNIA

8
9

TIMOTHY DANIEL FRIESON,

10

Plaintiff,

11

v.

12

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

13

Defendant.

14

Case No. 1:12-CV-01320-SMS

ORDER AFFIRMING AGENCY'S DENIAL
OF BENEFITS AND ORDERING
JUDGMENT FOR COMMISSIONER

15
16
17

Plaintiff Timothy Frieson, proceeding *in forma pauperis*, by his attorneys, Law Offices of

18

Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social

19

Security (the "Commissioner") denying his application for supplemental security income ("SSI")

20

pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is

21

before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the

22

Honorable Sandra M. Snyder, U.S. Magistrate Judge.  Following a review of the complete record

23

and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") to be

24

supported by substantial evidence in the record as a whole and based on proper legal standards.

25

## I.     Administrative Record

26

### A.     Procedural History

27

On July 7, 2008, Plaintiff applied for supplemental security income, alleging disability

28

beginning July 1, 2007.  The Commissioner initially denied the claim on November 18, 2008, and

upon reconsideration, on May 12, 2009.  On June 15, 2009, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a video hearing on April 12, 2011.[1]  On April 27, 2011, Administrative Law Judge Sharon L. Madsen denied Plaintiff's application.  The Appeals Council denied review on June 6, 2012.  On August 14, 2012, Plaintiff filed a complaint seeking this Court's review.

**B.**     **Factual Record**

**Plaintiff's testimony.**  Plaintiff Timothy Frieson (born August 3, 1988) lived with his brother and parents in the family home.  He had a driver's license and was able to drive.  He had completed high school, where he had been in special classes, with a GED.  His school program included work ability training, and he worked briefly at Jiffy Lube, having secured that job on his own.  He had been fired from his prior jobs for lack of attention and poor attendance.  Plaintiff was on probation for three years following a felony conviction.

Plaintiff was able to care for his own personal needs, make his bed, do laundry, and keep his own area clean.  He did not cook except to warm foods in the microwave.  He shopped with his parents.  His social life included visiting friends; he spent a typical day playing video games and "just kicking it" at a friend's house.  He liked to ride ATV's.  He was not good at managing his finances and needed his mother's assistance for budgeting and bills.

Plaintiff experienced continuing back pain following a fall from his bike.  The pain, located along his spine, occurred mostly when he bent over.  His mental issues included ADHD, which was treated with Concerta; bipolar disorder and sleep problems, which were treated with Seroquel; and difficulty with anger control.  Plaintiff's history included self-mutilation (cutting himself), which he described as relieving his stress, and three suicide attempts.  He received medication from the Mary K. Shell Center, where he was seen every two or three months.  Plaintiff reported auditory hallucinations more than once a week.  He experienced paranoia and crying spells.  Although he had a history of abusing alcohol and marijuana, he had been clean for six months at the time of his agency hearing.

---

[1]  Plaintiff appeared in Bakersfield, California; the ALJ presided by video from Fresno, California.

**Mother's testimony.**  Plaintiff's parents assumed custody when he was five days old and adopted him when he was five years old. Cheryl Frieson described her son as "extremely active, hyperactive.  He has learning disabilities, he has – his varied mood swings, he has poor concentration, he's confused sometimes."  AR 43.  In the past, he had cut himself, primarily on his arms.  Although he was not using drugs or alcohol, he was still experiencing problems.  Plaintiff occasionally tried to help clean up and fix things at home, but did not usually finish.

Mrs. Frieson did not think her son could work eight hours a day, five days a week.  His previous attempts to work had failed because he was unable to finish his tasks: he forgot the directions on how to perform the work and lost interest in the task.  She testified that Plaintiff did not have a GED but simply a certificate received for completing special education classes.

Plaintiff demonstrated explosive anger by hitting walls, slamming doors, or other activities that created noise.  He repeatedly got into fights with others: his parents had to retain an attorney to keep him in school.

Mrs. Frieson contradicted Plaintiff's testimony that he was capable of personal care, testifying that he needed direction to brush his teeth and to take showers.  In her third-party adult function report,[2] she reported needing to remind Plaintiff to change clothes, bathe, brush his teeth, use deodorant, and flush the toilet.  He could not remember his medication schedule.

According to his mother, Plaintiff had poor memory and concentration, and was unable to follow directions with more than two steps.  Explanations and directions typically had to be given more than once.

Mrs. Frieson reported that Plaintiff sometimes spent his days lying on the sofa, sleeping for hours.  On other days, he might watch television or get a ride to the mall.  Plaintiff enjoyed talking on the phone and preferred not to be alone.

**Educational records.**  The record includes Plaintiff's 2007 individualized education program report from Tehachapi Unified School District, which defined Plaintiff's disabilities as a specific learning disability and emotional disturbance.  Concluding that Plaintiff's emotional disturbance was

///

---

[2]  Because Mrs. Frieson also completed Plaintiff's adult function report, the two documents are substantially similar.

his primary disability, the educational team agreed with his counselor, Gene Dorsey of College Community Services, that Plaintiff was depressed and required all the counseling available.

Severe discrepancies existed between Plaintiff's intellectual ability and his achievement in basic reading, mathematics calculation, and written expression.  Plaintiff also displayed a psychological process disorder in attention.  His behavioral issues included disruptive yelling and profanity, and oppositional defiance.  Plaintiff's classroom instructor commented that Plaintiff's impulsivity often got him into trouble.  The educational team opined that Plaintiff's behavioral problems refocused the attention of the teacher and classmates as a means of denying or hiding his academic delays.  Plaintiff was on track to earn a certificate of completion, not a high school diploma.

Plaintiff, who was exposed prenatally to alcohol and methamphetamine, was diagnosed with fetal alcohol syndrome at age 5. Later, he was also diagnosed with attention deficit hyperactivity disorder (ADHD) and at various times, was diagnosed with Bipolar Disorder and Conduct Disorder. Plaintiff initially received special education for speech and language issues.  His behavioral problems developed in junior high school.  In February 2002, the district psychologist evaluated Plaintiff and changed the designation to emotional disturbance.

The IEP described Plaintiff's strengths as "Very determined.  Funny.  tries hard, Growing up," and his needs as "take more responsibility for his property and self-control."  AR 200.  He had significant anger issues, demonstrating an explosive temper.  He had friends and a girlfriend. Plaintiff was able to take care of his personal needs.  His educational goals and objectives included reducing his use of profanity; training to complete a generic employment application; developing the ability to read silently and comprehend at a second-grade level; and learning the multiplication tables.  Plaintiff's long-term goals were to live semi-independently and to secure competitive employment as an auto mechanic.

Plaintiff, an adult student (over 18 years old), had requested another year at school.  He was to attend an emotionally disturbed class for four to five periods daily, general education one or two periods daily, and periodically receive AB2726 (mental health) services from College Community Services.

4

His scores on the WAIS-II were within the low average range: full scale IQ of 86, verbal IQ of 82, and performance IQ of 92.  Tests indicated low average verbal comprehension, average perceptual organization, borderline working memory, and low average processing speed.  A UMI assessment revealed motor/perceptual skills in the low range.  Grade equivalents on the Woodcock-Johnson III Tests of Achievement ranged from 1.1 (writing samples) to 7.3 (picture vocabulary.

The report summarized Plaintiff's experience in job training:

Tim has been enrolled in the TUSD WorkAbility Program for the past 1 ½ years.  He worked for a large ranch in this area, a motorcycle shop, a feed store, auto parts store and a lubrication service store.  Tim was polite at work and had few complaints.  Tim is capable of using public transportation.  He enjoys work and always wants to pursue other employment.  He is interested in pursuing a career in auto mechanics working on quads, motorcycles and car engines.

AR 210.

**Medical records.**  Plaintiff's prescriptions included Seroquel to stabilize his moods and help him sleep, Wellbutrin for depression, and Concerta to help him maintain focus.

Plaintiff was treated at the Kern County Mental Health System ("KCMH") from August 1998 through October 2007.  According to the medical records, he primarily received bimonthly medication management appointments, administered by Campus Community Services.[3]

On April 3, 2007, Gary Farrer, M.D., noted that Plaintiff was angry and unstable.

Mary Hall, IMFT, completed a mental health assessment of Plaintiff on May 16, 2007.  Plaintiff's presenting problem was anger and aggression when others told him what to do.  He was indifferent and uncooperative about continuing mental health services since he wanted to discontinue medication so that he could get a job or join the marines.  He was already tapering off Concerta.  Plaintiff smoked cigarettes and drank undisclosed amounts of coffee daily.   He was unwilling to discuss suicidal intent. Plaintiff acknowledged a history of physical altercations that had resulted in multiple school suspensions, but stated that he now "only became verbally aggressive with others who[m] he dislikes and/or become argumentative with him."  AR 364.  Plaintiff's transition plan included (1) stabilizing mood, learning to self-regulate hyperactivity and increase attention span,

---

[3] References in the medical records suggest that Plaintiff may have also received regular "talk therapy," but the agency record omits therapists' notes, if any.

manage anger, and improve interpersonal relations; (2) securing employment, continuing education, or enlisting in the military; and (3) reassessment in twelve months.

On January 21, 2008, Malinda Alsop, MFT-Intern, evaluated Plaintiff at KCMH.  Plaintiff did not know why he was there, reporting that he came at his mother's direction.  He wanted to stop cutting himself, a habit that distracted him from feeling irritable.  He reported that he frequently got into fights but did not consider it to be a problem.  Plaintiff had difficulty falling asleep and once asleep, slept restlessly.  Although his doctors had prescribed many psychiatric medications, he was not taking any of them.

Plaintiff denied any use of illegal drugs even though the earlier agency records indicated abuse of alcohol and marijuana.  He smoked a pack of cigarettes and drank more than 20 ounces of Red Bull daily.  Plaintiff told Alsop that he belonged to a gang but did not identify it.

Although the agency's files said that Plaintiff had been expelled from school before obtaining a diploma or GED, Plaintiff told Alsop that he had graduated from Tehachapi High School six months earlier.  Alsop noted that Plaintiff had also been expelled from school in the seventh grade after punching the principal.  Thereafter, he attended the Aurora School, a special education center, for seventh and eighth grade.  Plaintiff showed little insight into his poor judgment and aggressive behavior.

Plaintiff attended the appointment wearing flannel pajama pants, a t-shirt, and a pink knit cap.  His fingernails were painted pink.  He fidgeted throughout the interview, chewing on cardboard.  Alsop opined that Plaintiff appeared bored, impatient and distracted, with little motivation to participate in mental health treatment.

Plaintiff denied suicidal or homicidal thoughts.  Alsop diagnosed Plaintiff:

| Axis I | 312.24 Intermittent Explosive Disorder |
| --- | --- |
| | Rule Out Bipolar Disorder |
| Axis II | Rule Out Antisocial Personality Disorder |
| Axis III | Hip pain and asthma |
| Axis IV | Primary support group; social environment, occupational |

///

6

Axis V          Current GAF: 43; Highest GAF: 45

AR 314.

Agency consultant Kimball Hawkins, Ph.D., psychologically screened Plaintiff on August 3, 2008.  Plaintiff was married, but he and his wife lived with their respective parents and were planning to divorce.  Plaintiff had a driver's license, secured on his fourth try.  He had graduated from Tehachapi High School in 2007.  He had no history of competitive employment.

Plaintiff reported insomnia, attention deficit hyperactivity disorder, a mood disorder, and a history of cutting himself.  He denied hallucinations, but reported a history of suicidal thoughts.  He denied drug or alcohol use but smoked a half pack of cigarettes daily.  He had previously been arrested for breaking and entering.

Dr. Hawkins described Plaintiff's appearance as "roughly groomed" and "eccentric," noting that Plaintiff had a red Mohawk haircut and painted fingernails, with tattoos on his arms, back, and leg.  Concentration and memory were impaired; intelligence was below normal.  Although Plaintiff was oriented in all spheres, he did not know the current month.  Plaintiff's performance on the Mini Mental Status Exam was below normal.  Dr. Hawkins summarized:

> He did not know what part of the city he was in, but knows he is in Bakersfield, California and is on the first floor of a the building.  He was able to recall three words immediately and two out of three words after a delay.  He has trouble subtracting serial 7's from 100 accurately, but got one calculation correct out of five attempts.  He was able to repeat some simple sentences, but did not follow multi-step directions without errors and redirection.  He was able to read and write simple notes and messages.  He copied designs with minor errors.

AR 319.

Although Dr. Hawkins did not conduct intellectual testing, instead relying on test scores from school reports, he concluded that Plaintiff had a significant learning disorder.  He opined that Plaintiff's ability to get and keep competitive employment was poor, adding:

> His ability to understand, remember, and carry out complex instructions is poor.  His ability to understand, remember, and carry out simple instructions is adequate on familiar tasks with minor errors.  His ability to maintain concentration, attention, and persistence is poor.  His ability to perform activities within a schedule and maintain regular attendance is poor.  His ability to complete a normal work day and work week without interruptions from psychologically

7

based symptoms is poor.  His ability to respond appropriately to changes in the work setting is poor because of sub-average abilities.  His ability to manage his own money is considered to be poor.

AR 319.

Dr. Hawkins recommended that Plaintiff (1) receive ongoing psychiatric follow-up and treatment; (2) receive counseling regarding adjustment related issues; and (3) be considered a candidate for supportive employment.

On August 7, 2008, Plaintiff was evaluated at College Community Services.  His chief complaints were cutting himself, irritability and "physical fights." AR 355.  He also complained of insomnia, hyperactivity, restlessness, problems with concentration, and risk taking behavior. Plaintiff denied depression or suicide attempts.  He smoked a pack a day but had not used alcohol or marijuana since he was placed on probation.  The medical history noted that Plaintiff was born five weeks prematurely and had tested positive for cocaine at birth.

On November 7, 2008, agency physician Kevin Gregg, M.D., assisted by trainee J. Risinger, performed the psychiatric review technique.  He noted that Plaintiff had both organic mental disorders and affective disorders, including disorientation to time and place, memory impairment, and mood disturbance, as well as sleep disturbance, easy distractibility, and "[i]nvolvement in activities that have a high probability of painful consequences which are not recognized." Dr. Gregg opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence or pace, and no repeated episodes of decompensation.  Gregg found Plaintiff to be moderately limited in his ability to remember locations and work-like procedures; to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities on a schedule, to maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially acceptable behavior and to adhere to basic standards of neatness and cleanliness.  In all other regards, Plaintiff was mildly impaired.  Because Plaintiff's mother reported that he was able to

drive, go out alone, go to the mall, and shop, Dr. Gregg considered Plaintiff to be only partially credible and concluded that Plaintiff was capable of performing simple repetitive tasks with no public contact.

Plaintiff received physical care at Clinica Sierra Vista.  On October 3, 2008, Plaintiff was treated for back pain after he was beaten by multiple persons; x-rays showed his lumbar spine was intact.  Follow-up treatment occurred on October 10, 16, 28, and November 4, 2008.  On November 14, 2008, Luis Teopengco, M.D., treated Plaintiff for leg pain, stomach pain, and a hip contusion following a fall from a bicycle.

On January 20, 2009, Mary L. Hall, IMFT, evaluated Plaintiff's mental health for KCMH.  Plaintiff's strengths included adequate grooming and hygiene; willingness to do housework and odd household jobs when asked; good relations with peers and family when provided with encouragement and focus; and a desire for vocational training and work.  Nonetheless, his hyperactivity and irritation affected his social interactions; he became defensive and verbally aggressive with those who did not respect him.  Although Plaintiff claimed to have good people skills, he was uncooperative with the KCMH interviewer.  He was pessimistic, easy to anger, and displayed oppositional behavior when faced with tasks he disliked.  He had poor concentration and was easily distracted.  His low motivation, anger, and agitation affected his ability to seek employment and independent housing: poor structure of his day limited Plaintiff's ability to follow-through and complete tasks.

Excessive mood swings and irritation influenced his decision to stay in bed in the mornings.  His learning disabilities limited vocational training available to him.  He was forgetful and tired easily.  His angry demeanor made him appear unapproachable.  A relapse into past substance abuse was possible and required attention.  Ms. Hall opined:

> Because Tim has had long-term ADHD symptoms, learning problems, and oppositional behaviors in his youth, he currently is experiencing manic episodes and mood swings which include anger, agitation, impulsiveness, and a grandiose type of demeanor which affects his ability to find and maintain employment.  However, because of lack of education and indecisiveness about higher education due to learning difficulties, Tim expresses a pessimistic attitude and is dependent upon his parents for housing and an income.  Needing much coaching and encouragement, Tim admits to wanting full-time employment and/or vocational

direction but is ambivalent and defensive towards others' intervention that demonstrates fear and anxiety about his future.  Although Tim is on three year probation for stolen property charges, he reports to have completed a substance abuse program and remains clean and sober, and claims to have terminated self-mutilation habits, thus seeks continued medication support, and case management to assist him in transitioning into young adulthood through modeling of appropriate interpersonal skills and encouraging personal growth through education and follow-through.

AR 351.

Ms. Hall diagnosed Plaintiff:

| | |
|---|---|
| Axis I: | 296.42 Bipolar I Disorder; Manic; Moderate |
| | 314.01 Attention Deficit/Hyperactivity Disorder—Combined Type |
| | 315.9 Learning Disorder NOS |
| Axis II: | V71.09 None |
| Axis III: | Asthma; GERDs |
| Axis IV: | Primary; social; occupational; educational |
| Axis V: | Current GAF: 50        Highest GAF: 50 |

AR 350.

Plaintiff's transition plan included (1) stabilizing mood, improving interpersonal relationships, managing anger appropriately, implementing relaxation, and enrolling in vocational training; (2) seeking employment and participating in organized sports or recreational activities; and (3) reassessment in twelve months.

At College Community Services on January 31, 2009, Plaintiff complained of recent increased mood swings.

At an April 16, 2009 progress appointment, Plaintiff reported that he was doing fine on his medications.  He was occasionally using alcohol.  Plaintiff refused blood testing.  Dr. Goklaney continued Plaintiff's medications.

Agency physician J. Mitchell, M.D., updated Plaintiff's case analysis on April 21, 2009.  He opined that Plaintiff's claims were less than credible since they were not fully supported by objective evidence in the record.  Noting that Plaintiff's reported back pain followed a beating and a bicycle accident, with no ongoing treatment, Dr. Mitchell opined that Plaintiff's back pain was not severe. He found no change since the November 2008 residual functional capacity determination.

Plaintiff was upset and anxious at an April 31, 2009 progress appointment, complaining of mood changes, loneliness, and anger.  He reported using marijuana two months prior.  Dr. Goklaney added a prescription for Tegretol.[4]

On May 7, 2009, after agency psychologist Martin B. Koretzky, Ph.D., considered KCMH's January 2009 evaluation, he too concurred with the November 2008 residual functional capacity determination.

At the July 16, 2009 progress appointment, Plaintiff told Dr. Goklaney he was doing fairly well but also complained of loneliness, anger, and sleep problems.  He was anxious, angry, and irritable.  Plaintiff reported drinking 32 ounces of beer.  He refused blood testing.

On November 18, 2009, Plaintiff was treated in the emergency room of Kern Medical Center.  He had been punched in the nose during a fight.

Plaintiff ran out of his medications before his December 17, 2009 progress appointment.  He was feeling "hyper" during the day and reported mood changes.  Plaintiff reported drinking two beers on weekends.  Dr. Goklaney prescribed Concerta, Seroquel, and Tegretol.

On October 26, 2010, Plaintiff was treated in the clinic at Kern Medical Center for depression and suicidal feelings.

**Vocational expert**.  Jose Chaparro testified as vocational expert.  Because Plaintiff had no prior significant gainful employment, Chaparro offered no opinion on Plaintiff's ability to perform his prior work.

For the first hypothetical question, the ALJ directed Chaparro to assume a hypothetical person of the same age, education, and work experience as Plaintiff.  The hypothetical individual had non-exertional limitations, but was restricted to simple routine tasks and occasional public contact.  Chaparro opined that such an individual could perform heavy and unskilled work as an industrial cleaner (DOT 381.687-014), 97,000 to 98,000 jobs available nationally and 9,000 jobs in California; horticultural worker II (DOT 405.687-014), 6,000 jobs nationally and 3,800 jobs in California; or

///

---

[4] Tegretol (Carbamazepine) is an anticonvulsant prescribed to control manic or mixed episodes in persons with bipolar disorder.  www.nlm.nih.gov/medlineplus/druginfo/meds/a682237.html (August 14, 2013).

general farm worker II (DOT 421.687-010), 86,000 to 87,000 jobs nationally and 55,000 to 56,000 in California.

For the second hypothetical question, the ALJ directed Chaparro to modify the hypothetical individual to one capable of performing "medium [work], a 50/25 sit/stand, walk/sit, the same simple routine tasks and occasional public contact." AR 49. Chaparro opined that such an individual could perform medium and unskilled work as an industrial cleaner (DOT 381.687-018), 21,000 jobs nationally and 2,000 jobs in California; laboratory equipment cleaner (DOT 381.687-022), 52,000 to 53,000 jobs nationally and 5,000 in California; or kitchen helper (DOT 318.687-010), 374,000 jobs nationally and 47,000 to 48,000 in California.

For the third hypothetical question, the ALJ directed Chaparro to consider the individual described in the second hypothetical but limited to simple routine tasks (SVP 1). Chaparro opined that such an individual could perform jobs such as rug cutter (SVP 1, medium); weeder-thinner (unskilled, medium) (DOT 409.687-018) with 5500 jobs nationally and 3500 in California; vegetable harvest worker (medium, unskilled, SVP 1) (DOT 402.687-014) with 5500 jobs nationally and 3500 in California; or bacon skin lifter (medium, unskilled, SVP 1) (DOT 521.687-126) with 36,000 to 37,000 jobs nationally and 3000 jobs in California.

For the fourth hypothetical question, the ALJ directed Chaparro to consider the individual described in hypothetical three except that he required constant supervision. Describing the hypothetical as "along the lines of sheltered work," Chaparro replied that no competitive work was available for such an individual.

Plaintiff's attorney then directed Chaparro to assume the same hypothetical person previously described with fourth grade levels of math and reading, impaired concentration, impaired memory, below average intelligence, poor ability to get and keep competitive employment, able to perform simple repetitive task, poor concentration, persistence, and pace, poor regular attendance, poor ability to complete a work day, and poor ability to adapt to changes in work settings. Chaparro opined that no jobs would be available for such a person.

12

///

In his second hypothetical question, Plaintiff's attorney directed Chaparro to assume the same individual with attention deficit hyperactivity disorder, poor concentration, extreme anger problems, easily distractible, impulsive, hyperactive, and forgetful, with learning problems, and who fidgets. Chaparro opined that no jobs would be available for such a person.

Finally, Plaintiff's attorney directed Chaparro to assume an individual with moderate problems, that is, with problems that would affect him or her 25 percent of the day.  This individual has moderate problems of concentration, persistence, and pace; accepting instructions from supervisors; attending regularly; working with others, working with the general public, working with co-workers, and cleanliness.  Chaparro opined that no jobs would be available for such a person.

## II.   **Discussion**

### A.   **Legal Standards**

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

Step one:   Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:   Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:     Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:      Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:      Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of July 7, 2008.  His severe impairments were attention deficit hyperactivity disorder, bipolar disorder, conduct disorder, learning disorder, and lumbar strain.  These impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.925 and 416.926).  Plaintiff was capable of performing the medium work as defined in 20 C.F.R. § 416.967 (c), specifically, simple routine tasks with occasional public contact.  He had no past relevant work.  Jobs that Plaintiff was capable of performing existed in significant numbers in the national economy.

## B.     Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making

14

findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

### C.  Plaintiff's Credibility

Plaintiff contends that the ALJ erred in failing to provide specific findings to support her conclusion that Plaintiff's testimony was not fully credible.  The Commissioner counters that the ALJ appropriately discounted Plaintiff's subjective complaints based on his active lifestyle and the lack of objective support for his allegedly disabling limitations.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between his testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at 959.

Focusing on the ALJ's conclusory paragraph, which appears at the top of AR 19, Plaintiff argues that the ALJ failed to make specific findings sufficient to support her conclusions, as required by *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991).  The Court disagrees.  The ALJ preceded the "conclusory" paragraph with seven paragraphs: the first three of which set forth the applicable standards for reconciling a claimant's subjective reports of pain and other symptoms with the medical evidence within the record.  The remaining four paragraphs summarize the testimony of Plaintiff and his mother concerning his activities, "which are not limited to the extent one would expect," including care of personal grooming needs, preparation of simple meals, watching television, listening to music, visiting on the phone, walking, using public transportation, driving, shopping, visiting with friends and family, riding a bicycle, going to the mall, making his bed, cleaning his room, riding an ATV, and playing video games.  AR 18.  The ALJ acknowledged that Plaintiff experienced limitations in remembering, completing tasks, concentrating, understanding, and following instructions.  But because neither Plaintiff nor his mother could quantify these

limitations, the ALJ gave their testimony little weight. Following the "conclusory" paragraph, the ALJ spent in excess of a page summarizing the reports of the consultative physician, Dr. Hawkins, and the opinions of the agency physicians.

The ALJ also noted that Plaintiff and his mother testified that he was able to walk for one hour, and found that testimony to be inconsistent with medical evidence.  As the ALJ had noted at step 2, Plaintiff was treated for back injuries following an altercation, but x-rays revealed that his lumbar spine was intact.  Since the record includes no evidence of a chronic back ailment that impaired Plaintiff in any way, the ALJ appropriately gave little weight to Plaintiff's complaints that his back hurt while bending.

Plaintiff does not challenge the ALJ's observation that his haphazard compliance with his physician's schedule of prescribed medications also suggested that his psychological symptoms may not have been as severe as he alleged.[5]  The record reflected both periods of total noncompliance, in which Plaintiff took none of his prescribed medications, and periods in which Plaintiff modified the prescribed dosages, generally taking much less medication than had been prescribed.  *See also* 20 C.F.R. § 416.930 (b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . ").

"An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged."  42 U.S.C. § 423 (d)(5)(A). If an ALJ were required to believe every claimant's statements about his pain or other symptoms, disability benefits would be available for the asking, an outcome that Congress did not contemplate

---

[5]  The ALJ did not specifically note that Plaintiff generally refused the blood testing that would have permitted Dr. Goklaney to monitor the blood levels of his prescriptions as well as to identify any abuse of alcohol or other illicit substances.

in enacting the Social Security Act. *See Fair*, 885 F.2d at 603.  Here, the ALJ set forth her basis for

discounting the opinions of Plaintiff and his mother in light of medical evidence that combined with

substantial evidence of Plaintiff's active and largely independent life style, undermined their

assertions that Plaintiff was unable to perform work of any kind.  She was required to do no more.

### D.     Physicians' Opinions

Plaintiff challenges the ALJ's analysis of the medical evidence in the record, contending that

she failed to give due consideration to his greater limitations, as opined by his treating physicians,

Dr. Hawkins, and the non-examining agency physicians.  The Commissioner replies that the ALJ

properly based her conclusion on the opinions of Dr. Hawkins and the agency physicians.

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions

regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to

perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound by

an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S. S.

R. 96-5p.  The regulations provide that medical opinions be evaluated by considering (1) the

examining relationship; (2) the treatment relationship, including (a) the length of the treatment

relationship or frequency of examination, and the (b) nature and extent of the treatment relationship;

(3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict

a medical opinion.  28 C.F.R. § 404.1527(d).  In this case, opinions on Plaintiff's ability to perform

work occurred in two contexts: (1) direct consideration of Plaintiff's residual functional capacity by

consultative physician Dr. Hawkins and the agency physicians and (2) opinions concerning

Plaintiff's ability to transition from special education to work in the evaluations and treatment notes

of KCMH physician Dr. Goklaney and therapist Mary Hall and intern Malinda Alsop.  None of

Plaintiff's treating physicians offered an opinion of Plaintiff's residual functional capacity in the

context of his application for Social Security disability benefits.

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician.  *Id.*  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Once a court has considered the source of a medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The ALJ may reject the uncontradicted opinion of a treating or examining medical physician only for clear and convincing reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.  Even though the treating physician's opinion is generally given greater weight, when it is contradicted by an examining physician's opinion that is supported by different clinical findings the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

In the hearing decision, the ALJ carefully analyzed the opinions of Dr. Hawkins and the agency physicians, drawing factual support from Dr. Goklaney's treatment notes and Ms. Hall's January 2009 mental health reassessment for KCMH.  Plaintiff does not object to the ALJ's limited attention to the KCMH treatment records.  Dr. Goklaney, whose relationship with Plaintiff consisted of periodic appointments to supervise Plaintiff's prescription medications, primarily recorded Plaintiff's subjective reports of how the prescriptions were working.

Ms. Hall and Ms. Alsop prepared the periodic KCMH evaluations.  Marriage and family therapists, such as Ms. Hall and Ms. Alsop, are not acceptable medical sources to establish an impairment.  20 C.F.R. § 913(a).  An ALJ may only use the opinions of other sources, including social welfare agency personnel such as therapists, as evidence of the severity of the claimant's impairment or how it affects the claimant's ability to work.  20 C.F.R. § 913 (d).

Arguing that the ALJ undervalued those portions of the opinions of the treating and examining physicians that indicated that severe vocational impact of Plaintiff's limitations, Plaintiff forgets the standard of review: the ALJ's determination must stand as long as it is supported by substantial evidence in the record. The hearing decision appropriately relied on the agency physicians' agreement that Plaintiff had severe impairments but was capable of work, provided it was simple and repetitive, and did not require Plaintiff to interact with the public.  That Plaintiff would have interpreted the evidence differently is insufficient to reverse a decision supported by substantial evidence.

**E.**      **Hypothetical Questions**

Finally, Plaintiff challenges the ALJ's decision based on her relying on her own hypothetical questions rather than those posed by Plaintiff's attorney.  As detailed in the statement of facts, above, the ALJ structured her questions to reflect the exertion levels used in determining residual functional capacity for Social Security disability benefits.  Plaintiff's attorney structured his questions to set forth various combinations of Plaintiff's symptoms and diagnoses.

The Commissioner properly responds that the ALJ need not favor a hypothetical that includes subjective limitations or those that she has found to be unsubstantiated by medical evidence. *See Thomas*, 278 F.3d at 959-60; *Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001). An ALJ may appropriately limit hypothetical questions to those supported by substantial evidence in the record. *Magallanes*, 881 F.2d at 756-57. The ALJ did not err in relying on her own determination of limitations supported by substantial evidence.

**III.     Conclusion and Order**

The Court finds that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court hereby DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   **August 21, 2013**              **/s/ Sandra M. Snyder**
                                              UNITED STATES MAGISTRATE JUDGE